# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **MARY E. PRICE** | : | **CIVIL ACTION** |
| *Plaintiff, Counterclaim Defendant,* | : | |
| *pro se* | : | **NO. 19-4633** |
| | : | |
| **v.** | : | |
| | : | |
| **COMMONWEALTH CHARTER** | : | |
| **ACADEMY CYBER SCHOOL** | : | |
| *Defendant, Counterclaim Plaintiff* | : | |

NITZA I. QUIÑONES ALEJANDRO, J.                                        APRIL 14, 2021

# MEMORANDUM OPINION

## INTRODUCTION

Plaintiff Mary E. Price, in her own right as the parent of minor T.R., commenced this action against Defendant Commonwealth Charter Academy ("CCA"), under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400 *et seq.*,[1] and Section 504 of the Rehabilitation Act ("Section 504"), 29 U.S.C. § 794, seeking enforcement of a hearing officer's administrative decision that granted a compensatory education award to T.R.  [ECF 2].  CCA later asserted counterclaims against Plaintiff for wrongful use of civil proceedings and seeks declaratory judgment regarding its obligation to pay for compensatory education services for T.R.  [ECF 20].

Before this Court are the parties' cross motions for summary judgment.  In CCA's motion for partial summary judgment, [ECF 24, 25], CCA moves for summary judgment on Count I of

---

[1]     The IDEA was amended and renamed the Individuals with Disabilities Education Improvement Act (the "Act"), effective July 1, 2005.  *See* Pub. L. No. 108-446, 118 Stat. 2715 (2005). Notwithstanding this change in the name of the statute, courts and litigants, including the parties in this action, continue to refer to this statute as the IDEA.  *See, e.g.*, *H.E. v. Walter D. Palmer Leadership Learning Partners Charter Sch.*, 873 F.3d 406, 408 (3d Cir. 2017).  For purposes of clarity and consistency, this Court will refer to the Act as the IDEA in this Memorandum Opinion.

Plaintiff's complaint (Enforcement of the Hearing Officer's Decision) and on Count I of its counterclaims (Declaratory Judgment).  In Plaintiff's motion for summary judgment,[2] [ECF 26], Plaintiff seeks summary judgment on all counts of her complaint and all counts of CCA's counterclaims.  The motions are fully briefed and ripe for disposition.  For the reasons stated herein, CCA's motion for partial summary judgment is granted, *in part*, and Plaintiff's motion for summary judgment is denied.

**BACKGROUND**

When ruling on a motion for summary judgment, a court must consider the evidence in the light most favorable to the non-movant. *Galena v. Leone*, 638 F.3d 186, 196 (3d Cir. 2011).  The relevant factual background is as follows:[3]

Plaintiff is the mother of minor T.R., who is a student at CCA.  At all relevant times, CCA was, and continues to be, T.R.'s local education agency ("LEA").  T.R. is diagnosed with multiple mental disabilities that affect T.R.'s learning.

In September 2016, following an administrative hearing, Hearing Officer Charles W. Jelley (the "Hearing Officer") issued a decision finding that CCA had denied T.R. a free and appropriate public education ("FAPE").  As relief, the Hearing Officer granted T.R. a compensatory education award ("CEA") of 2,820 hours of compensatory education services, to provide "the equitable remedy of specific performance of [CCA's] past FAPE duties."  (Hearing Officer's Decision, ECF 24-1, Ex. A, at p. 21).  In the Hearing Officer's Decision and Order, he prescribed the terms for how this CEA could be used.  Specifically, in his Decision, the Hearing Officer indicated: "[CCA] is directed to pay a third party provider to provide the compensatory education services at the prevailing rate in the community where the services are provided.  The Parent selected third party provider may use the compensatory education hours to provide whatever specially–designed instruction, related services, assistive technology, supplemental services, and aids necessary to make [T.R.] whole. . . . [CCA] should reimburse the service

---

[2]    The Court is treating Plaintiff's filing entitled "brief in support of its motion for summary judgment," [ECF 26], as a motion for summary judgment and a response to CCA's motion for partial summary judgment.

[3]    The facts are taken from the parties' filings and exhibits attached thereto.  Any relevant factual disputes are noted.

provider at the customary rate for services rendered in the market or location where the services are provided. Four times a year the third party provider, selected by the Parent, will give the Parent a progress report verifying the Student's measurable progress." (*Id*. at p. 22). These terms for use of the CEA were reiterated in the Hearing Officer's accompanying Order, which indicated: "[CCA] is Ordered to reimburse the Parent selected provider the costs for the services provided at the hourly rate charged for the services in the location where the services are provided." (*Id*. at p. 23).

*Facts Regarding Fusion Academy*

After the CEA was awarded, CCA worked with Plaintiff to use the allocated hours to provide various services to T.R. In July 2019, Plaintiff notified CCA that she wanted to use the CEA for T.R. to receive full-time services at a private school, Fusion Academy ("Fusion"). CCA responded that T.R. could use the CEA award for that purpose and, because Pennsylvania law requires public schools (like CCA) to provide a minimum of 990 hours of instructional time per year for a high school student, 990 hours would be deducted from T.R.'s CEA. While Plaintiff was communicating with Fusion to finalize the logistics of T.R.'s attendance, Plaintiff informed CCA that Fusion had proposed to provide 401 50-minute "sessions" of services to T.R. for the year, resulting in a total of only 334.17 hours of instructional time for the year, which is less than half of the number of hours that CCA was obligated to ensure T.R. received.

In response to the deficient number of instructional hours, CCA offered Plaintiff two options: (1) T.R. could withdraw from CCA and fully enroll at Fusion, making Fusion T.R.'s LEA and, thereby, the entity responsible for ensuring compliance with applicable state law; or (2) T.R. could use his CEA for the approximately 334 hours of instructional time that Fusion proposed to provide, and CCA would provide the remaining 660 required hours of instruction. Plaintiff rejected both options and informed CCA that she would work with Fusion to develop a new course plan that would "allow [T.R.] to receive full-time services using [Fusion's] curriculum while still meeting the mandated 990-instructional hour requirement." (Plf. Br., ECF 26, at p. 9).

Plaintiff next proposed that Fusion would provide T.R. with 540 one-hour sessions of services and 540 hours of services in the form of a "homework café" in which Fusion employees would supervise T.R. completing his homework, for a total of 1,080 hours for the year. However, Plaintiff insisted that CCA only deduct 540 hours from the CEA because Fusion characterized the "homework café" hours as "included" with the purchase of the 540 hours of one-hour instructional sessions and would not impose an additional charge beyond the cost of the one-hour instructional sessions. CCA rejected Plaintiff's proposal and indicated that it would deduct the exact number of hours that Fusion provided from the CEA (1080 hours). Plaintiff did not agree to that arrangement.

Because the issue remained unresolved, CCA made another proposal that involved applying an hourly conversion rate of $75 to Fusion's charges for T.R.'s full-time services. Under this proposal, instead of deducting the precise number of hours of instruction provided, CCA would divide Fusion's total charge for T.R.'s services ($55,800) by the hourly conversion rate to determine how many hours would be deducted from the CEA. In other words, the total charge of $55,800, divided by the hourly conversion rate of $75, would equal $744 dollars, which would be converted to 744 hours to be deducted from the CEA.[4] Under this proposal, T.R. would receive 1,080 hours of services (a combination of the one-hour instructional sessions and the "homework café" hours), but CCA would only deduct 774 hours from the CEA. Plaintiff countered that she wanted a conversion rate of $125, but later rescinded that proposal.

Ultimately, T.R. did attend Fusion for the 2019-2020 academic year and CCA paid Fusion's invoices in full. The parties continued to negotiate, but never reached an agreement regarding how many hours should be deducted from the CEA for the services provided.

For the purpose of establishing the prevailing rate charged for similar services in the location/community where T.R. would receive services, CCA identified four contracts with different service providers in the geographic area where T.R. lives[5] and where Fusion is located. Collectively, the four contracts indicate an average rate of $70/hour for tutoring and instruction by a certified teacher and $48.50/hour for those services provided by an uncertified instructor.

*Facts Regarding Advocacy Unlimited*

While the aforementioned negotiations were underway, Plaintiff entered into a "Consultancy Agreement" contract with a company named Advocacy Unlimited "to provide services on behalf of [T.R.] after negotiations with CCA regarding [T.R.]'s full-time educational plan at Fusion stalled." (Plf. Br., ECF 26, at p. 11). The "Consultancy Agreement" indicated that (1) the contract is between "[Advocacy Unlimited] and (the "Parent") Mary Price on behalf of T.R. (the "child")" and (2) CCA was the entity that would pay Advocacy Unlimited's fees, despite the fact that CCA was not a party to the contract. The only specifically-defined services mentioned in the Consultancy Agreement were Individualized Education Program ("IEP") meeting support, and the vague statement that Advocacy Unlimited will serve as a "third-party provider to deliver the compensatory education services to [T.R.] in accordance with the terms of his [CEA]." (Consultancy Agreement, ECF 2, Ex. D, at p. 114-15).

---

[4]     Fusion's actual hourly rate was approximately $103. Thus, if CCA had used the actual hourly conversion rate, T.R. would have had 542 hours deducted from his CEA.

[5]     T.R. lives in Upper Darby School District.

On August 22, 2019, Naomi Studevan, an Education and Behavioral Health Consultant from Advocacy Unlimited, contacted CCA via e-mail.  In the e-mail, Studevan indicated that she was "supporting Ms. Mary Price on behalf of . . . [T.R.]" regarding the above-described dispute over T.R.'s CEA.  (E-mails from and to Naomi Studevan, ECF 2, Ex. C, at p. 107).  Studevan further indicated that she believed that CCA's proposals "not only do[] not abide by what was set forth by the [Hearing Officer's Decision and Order], but quite frankly is an unreasonable request that no consultant, attorney or anyone else looking out for the best interest of this child, would recommend[.]"  *Id.*  She also described CCA's proposals as "unethical" and "illegal," and asked that CCA "approve and pay for the number of sessions/hours that [Plaintiff and Fusion] have agreed upon[.]"  *Id.*  In follow-up e-mails, Studevan attempted to advocate on Plaintiff's behalf for Plaintiff's desired resolution, and "request[ed], on behalf of [Plaintiff] and [T.R.], an IEP meeting[.]"  *Id.* at p. 108.

In September 2019, CCA received invoices from Advocacy Unlimited seeking payment for the services Studevan provided.[6]  The descriptions of services on the invoices included the following: phone calls and meetings "with parent"; "[r]eview of documentation"; "correspondence with CCA via email"; "[c]orresponding with mom and CCA attorney via email"; and "IEP meeting." (Invoices, ECF 2, Ex. D, at p. 118-19).  CCA informed Studevan and Plaintiff that (a) CCA had not contracted with Advocacy Unlimited to provide any services to T.R., and (b) it could not use T.R.'s CEA hours to pay for the billed services because Studevan's services were not the type that the Hearing Officer's Decision and Order permitted to be covered by T.R.'s CEA.  Plaintiff disagrees with CCA's explanation for refusing to pay the invoices and argues that the CEA hours can be used to pay for Studevan's services because said services were "necessary to make TR whole."  (Plf. Br., ECF 26, at p. 7).

---

[6]     In a September 30, 2019 e-mail, Studevan referred to the services billed in the invoices as "services that I have provided to Ms. Price and [T.R.]" and indicated that "Ms. Price was well within her rights to obtain [Studevan's] services in the pursuance of the best education and resources for [T.R.]"  (E-mails from and to Naomi Studevan, ECF 2, Ex. D, at p. 124).

In a September 17, 2019 e-mail, Plaintiff referred to the services billed in the invoices as "services provided on behalf of [T.R.,]" and indicated (1) that Studevan "is currently supporting me on behalf of [T.R.,]" (2) that Studevan's services are "services she is provide on [T.R.]'s behalf[,]" and (3) that Studevan's services consisted of Studevan "assist[ing] with negotiating the terms of [T.R.'s] educational services at Fusion Academy, as well as, his programming at CCA."  (E-mails from and to Naomi Studevan, ECF 2, Ex. D, at p. 121).

**LEGAL STANDARD**

Federal Rule of Civil Procedure ("Rule") 56 governs the practice of summary judgment motions and provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is "material" if its existence or non-existence might affect the outcome of the case, and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Under Rule 56, the court must view the evidence in the light most favorable to the non-moving party.  *Galena*, 638 F.3d at 196.

The movant bears the initial burden of identifying evidence that "demonstrate[s] the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also UPMC Health Sys. v. Metro. Life Ins. Co.*, 391 F.3d 497, 502 (3d Cir. 2004).  Once the movant has met its initial burden, the non-movant must rebut the motion by identifying "some evidence in the record that creates a genuine issue of material fact." *Berckeley Inv. Group, Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006).  In doing so, the non-movant must rely on facts in the record and "cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument[,]" *id.*, or on "bare assertions, conclusory allegations[,] or suspicions."  *Fireman's Ins. Co. of Newark v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982).  If the non-movant "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial[,]" then the court should grant summary judgment for the movant. *Celotex*, 477 U.S. at 322.

When the parties have filed cross motions for summary judgement, courts must "rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." *Auto-Owners Ins. Co. v. Stevens & Ricci, Inc.*, 835 F.3d 388, 402 (3d Cir. 2016). Additionally, *pro se* filings must be held "to less stringent standards than formal pleadings drafted by lawyers[.]" *Haines v. Kerner*, 404 U.S. 519, 520 (1972); *see also Robredo v. Metro Honda*, 689 F. App'x 724, 725 (3d Cir. 2017) (applying this liberal standard of review to *pro se* summary judgment filings).

**DISCUSSION**

As noted, the parties have each filed a motion for summary judgment. This Court will address each count of the complaint and counterclaims *seriatim*, in light of the parties' motions.

### Count I of Plaintiff's Complaint: Enforcement of the Hearing Officer's Decision

The IDEA grants "[a]ny party aggrieved by the findings and decision of the administrative proceedings [the right] to bring a civil action in state or federal court." *D.E. v. Cent. Dauphin Sch. Dist.*, 765 F.3d 260, 276 (3d Cir. 2014) (citing 20 U.S.C. § 1415(i)(2)) (internal quotations omitted). "[I]ndividuals seeking to enforce a favorable decision obtained at the administrative level are 'aggrieved' for purposes of the IDEA and may properly pursue such claims in court." *Id.* at 278. "The Third Circuit has definitively interpreted this provision to confer jurisdiction where . . . [a plaintiff alleges that] an LEA refuses to comply with a hearing officer's decision . . . ." *Lejune v. Khepera Charter Sch.*, 327 F. Supp. 3d 785, 793 (E.D. Pa. Aug. 19, 2018) (citing *D.E.*, 765 F.3d at 278).

The relevant portions of the Hearing Officer's Decision and Order are detailed *supra*. Pursuant to that Decision and Order, CCA is required to pay a provider—selected by Plaintiff—for "whatever specially-designed instruction, related services, assistive technology, supplemental services, and aids necessary to make [T.R.] whole." (Hearing Officer's Decision, ECF 24-1, Ex. A, at p. 21). Whatever services a provider renders in order to "make T.R. whole" must attempt to remedy CCA's past failure to provide a FAPE, which occurred when CCA implemented IEPs that were "not reasonably calculated to provide 'meaningful benefit' and 'significant learning.'" *Id.* at p. 20. In other words, the services a provider renders must "execute the equitable remedy of specific performance of [CCA]'s past FAPE duties." *Id.* at p. 21. "[This] equitable remedy of specific performance will provide [T.R.] with the lost benefits promised[.]" *Id.* at p. 22.

Plaintiff contends that CCA has failed to comply with the Decision and Order in two ways: (1) by proposing unacceptable plans (and rejecting Plaintiff's plans) for how to distribute the CEA hours to facilitate T.R.'s receipt of full-time services from Fusion; and (2) by refusing to pay for the services rendered by Education and Behavioral Health Consultant Naomi Studevan. Both parties move for summary judgment on this claim. This Court will address each alleged failure to comply separately.

*I. CCA's Actions Regarding Fusion Academy*

In CCA's motion for summary judgment, CCA argues that the undisputed facts establish that it complied with the Hearing Officer's Decision because its proposals regarding Fusion's services for T.R. were consistent with the Hearing Officer's Decision and Order, and because each of Plaintiff's proposals that CCA rejected were inconsistent with the Hearing Officer's Decision. In Plaintiff's motion, she argues that the undisputed

facts establish that CCA's proposals denied her "full access" to the CEA and that CCA's refusal to accept her proposals constitutes a refusal to comply with the Hearing Officer's Decision and Order.

At the outset, it is worth noting that the parties do not dispute that Fusion is an acceptable third-party provider or that the services Fusion provided to T.R. are covered by CEA—that is, the parties agree that CEA hours can be used for Fusion's services. The dispute between the parties is a narrow one: how many hours should be deducted from T.R.'s CEA for the services Fusion provided? The only applicable, guiding provision of the Hearing Officer's Decision is that CCA is obligated to pay Fusion for its services at a rate that is described three ways: (1) "at the prevailing rate in the community where the services are provided"; (2) "at the customary rate for services rendered in the market or location where the services are provided"; and (3) "at the hourly rate charged for the services in the location where the services are provided." (Hearing Officer's Decision, ECF 24-1, Ex. A, at p. 22-23). Condensing these descriptions into a concisely stated requirement: CCA is obligated to pay Fusion at the customary, prevailing hourly rate in the community, market, or location where Fusion provides services to T.R.

In the context of this claim, the parties do not have a dispute regarding the geographic portion of the requirement; it is undisputed that T.R. lives in Upper Darby School District and that Fusion is located in Haverford in the adjacent School District of Haverford Township, which are both located in Delaware County, Pennsylvania. Rather, the parties dispute the hourly-rate portion of the requirement. Therefore, the relevant inquiry before this Court is whether CCA violated the Hearing Officer's Decision and Order by proposing the rates that it did and by rejecting the rates Plaintiff proposed.

As noted, the parties collectively made seven proposals regarding how to pay for Fusion's services.[7]  Briefly, CCA proposed that: (1) T.R. receive 990 hours of instruction at Fusion and 990 hours be deducted from the CEA; (2) T.R. withdraw from CCA and fully enroll at Fusion, making Fusion T.R.'s LEA; (3) T.R. receive 334 hours of instruction at Fusion (as Fusion's original enrollment plan suggested) and 660 hours of instruction at CCA, and 334 hours be deducted from the CEA; (4) T.R. receive 1080 hours of instruction at Fusion (half of which would be one-on-one instructional sessions and half of which would be "homework café" sessions) and 1080 hours be deducted from the CEA; and (5) T.R. receive 1080 hours of instruction at Fusion (in the same proportions previously noted) and a conversion rate of $75/hour be applied to Fusion's tuition charges, resulting in 744 hours being deducted from the CEA.  Plaintiff proposed that: (6) T.R. receive 334.17 hours of instruction at Fusion, no additional hours at CCA, and 334.17 hours be deducted from the CEA; and (7) T.R. receive 1080 hours of instruction at Fusion (in the same proportions previously noted) and 540 hours be deducted from the CEA.  This Court will address the parties' arguments regarding each proposal individually to determine whether CCA's offer or rejection of each proposal violated the Hearing Officer's Decision and Order.

**CCA's first offer** was that T.R. receive 990 hours of instruction at Fusion and 990 hours be deducted from the CEA.  This proposal was consistent with terms of the CEA because it reflected an hour-for-hour deduction for services rendered.  **CCA's second offer** was that either T.R. withdraw from CCA and fully enroll at Fusion, making Fusion T.R.'s LEA, or (**CCA's third offer**) T.R. receive 334 hours of instruction at Fusion (as Fusion's

---

[7]      As noted in the Background Section, Plaintiff had also proposed an hourly conversion rate of $125/hour, but rescinded that proposal.  Since CCA did not reject that proposal, this Court will not address it here, as it does not involve any conduct by CCA to be evaluated.

original enrollment plan suggested) and 660 hours of instruction at CCA, and 334 hours be deducted from the CEA. Plaintiff always has the discretion to disenroll her child from CCA, under which circumstances CCA would no longer "bear[] full responsibility for providing special education services to students with disabilities." *R.B. v. Mastery Charter Sch.*, 762 F. Supp. 2d 745, 752-53 (E.D. Pa. Dec. 29, 2010) (quoting 22 Pa. Code § 711.3 and citing 34 C.F.R. § 300.209(c)). Thus, the offer of disenrolling T.R. from CCA did not violate the CEA's terms; rather, it presented a viable alternative to using the CEA for Fusion's services, and it reflected CCA's mindfulness of its legal obligations to ensure T.R. that receives an education consistent with federal and state law.

The second part of the proposal (CCA's third offer) in which CCA alternatively offered for T.R. to receive 334 hours of instruction at Fusion (as Fusion's original enrollment plan suggested) and 660 hours of instruction at CCA, and 334 hours be deducted from the CEA, was also consistent with terms of the CEA because it reflected an hour-for-hour deduction for services rendered. Not only was this option consistent with the CEA, it also guaranteed that CCA would be complying with its legal duty, as T.R.'s LEA, to ensure that T.R. received a minimum of 990 hours of instructional time per academic year. *See* 22 Pa. Code § 11.3(a) (minimum required hours of instruction for high school students is "990 hours for the school term").

**CCA's fourth offer** was that, if T.R. would receive 1080 hours of instruction at Fusion as Plaintiff suggested in the revised course plan that she and Fusion created, then CCA would deduct 1080 hours from the CEA. CCA argues that this is merely another hour-for-hour deduction. Plaintiff, however, argues that this hour-for-hour deduction is impermissible under the CEA because of how Fusion bills for the 1080 hours of services.

Under the revised course plan, Fusion would provide 540 hours of one-on-one instructional sessions, for which it would charge its full-tuition charge of $55,800, and provide 540 hours of "homework café" sessions where instructors would supervise T.R. completing his homework assignments, for which there would not be an additional fee because the "homework café" sessions were "included" with the purchase of the 540 hours of one-on-one instructional sessions. Plaintiff contends that because Fusion would not impose a separate bill for the 540 "homework café" hours, those hours should not be deducted from the CEA. CCA disagreed and argues that it can deduct the exact number of hours from the CEA as the number of hours of services actually rendered.

The CEA requires CCA to pay a provider for "whatever specially-designed instruction, related services, assistive technology, supplemental services, and aids necessary to make [T.R.] whole." (Hearing Officer's Decision, ECF 24-1, Ex. A, at p. 22). Therefore, CCA must pay Fusion for the services Fusion renders to T.R. Under this third proposal, Fusion's services would undisputedly amount to 1080 hours of services. It is irrelevant whether instruction or supplemental service are provided during each hour— only the total number of hours matters. Because Fusion would be providing 1080 hours of services to T.R., CCA would be required to pay Fusion for 1080 hours of services at a cost of $55,800. CCA was willing to pay Fusion under this arrangement. Clearly, there is nothing improper about an hour-for-hour deduction from the CEA. Therefore, this Court finds that CCA did not violate the Hearing Officer's Decision and Order when it offered the 1080 hour-by-hour arrangement.[8]

---

[8]     Contrary to Plaintiff's assertions, it makes no difference whether Fusion also would have charged $55,800 for only 540 hours of services. Indeed, CCA offered to pay that same fee and deduct 540 hours from the CEA, as long as T.R. received the remaining legally-required hours of instruction from CCA (as described in CCA's third offer). Plaintiff, however, rejected that proposal, as well. How Fusion, a third-

**CCA's fifth offer** was that T.R. receive the 1080 hours of instruction at Fusion and, instead of an hour-by-hour calculation, it would apply an hourly conversion rate of $75 to Fusion's charges for the 1080 hours of instruction, which would result in 744 hours being deducted from the CEA.  Plaintiff argues that this proposal violates the terms of the CEA because an hourly rate of $75 (a) does not constitute an "hourly rate charged for the services in the location where the services are provided[,]" as required by the Hearing Officer's Decision and Order, (*see* Plf. Br., ECF 26, at p. 10), and (b) has "absolutely nothing to do with the $10[3].00 per hour rate that Fusion charges[.]" (*Id.* at p. 11).  In response, CCA argues that the $75/hour conversion rate *does* constitute a rate consistent with the terms of the CEA, which is all that is required by the Hearing Officer's Decision and Order, and so it is irrelevant (in determining CCA's compliance with the terms of the CEA) what Fusion actually charges.

As noted, a concise statement of the funding requirement is that CCA must pay Fusion at the customary, prevailing hourly rate in Upper Darby and Haverford Township school districts.  The question then becomes whether the $75/hour rate is a customary, prevailing rate in those school districts.  In its motion, CCA points to definitions of the words "prevailing" and "customary" as instructive, and Plaintiff does not dispute the validity or applicability of those definitions.  Thus, this Court accepts the offered definitions of the relevant terms.  The word "prevailing" is defined as "widespread" and "what is most frequent or common at a certain time or . . . place." (Def. Br., ECF 25, at p. 11) (citing *American Heritage Dictionary*, Fifth Edition, 2016).  The word "customary" is

---

party provider, chooses to bill for its services is not within the control of either party.  Regardless of the cost of a 540-hour course plan or a 1080-hour course plan, CCA was willing to pay the bill.  CCA's only clarification was that it would deduct the exact number of hours of services rendered from the CEA.  As previously stated, there is nothing improper about an hour-for-hour deduction from the CEA.

defined as "commonly practice, used or encountered; usual." *Id*.  As evidence of what rates are "most frequent or common" and "commonly used" in the relevant school districts, Defendant points to four contracts for tutoring and instruction with four different service providers within a twenty-two (22) mile range of T.R.'s school district.  Collectively, the four contracts reflect an average rate of $70/hour for a certified teacher and $48.50/hour for an uncertified instructor.  If Fusion's hourly rate ($103/hour) is factored into the calculation along with the four contracts, the average rate becomes $76.60/hour for a certified teacher, $59.40/hour for an uncertified instructor, and $63.63/hour for a combined average for certified and uncertified instructors.  As CCA pointed out, Plaintiff offers no evidence regarding what rates are "most frequent or common" and "commonly used" in the relevant school districts, nor any evidence to contradict the aforementioned contract evidence provided by CCA.  Therefore, this Court must determine whether CCA's proposed rate of $75/hour was a customary, prevailing rate in the context of the aforementioned rates and averages.

Plainly, CCA's proposed rate of $75/hour is higher—and, therefore, more generous—than all but one of the four other providers' rates.[9]  Additionally, CCA's proposed rate is higher than the average rate among the four contracts ($70/hour) and only $1.60/hour less than the average when Fusion's rate is included in the calculation.  Further, CCA is correct that Fusion's actual rate, while potentially relevant to establish the customary, prevailing rate, is not determinative in evaluating whether CCA complied with the terms of the CEA.  The Hearing Officer's Decision and Order do not require CCA to

---

[9]     The breakdown of the contracts with four different service providers appears in CCA's brief.  (*See* Def. Br., ECF 25, at p. 17).  Briefly, the hourly rates for certified teachers included hourly rates of $65, $67, $68, and $80.

pay whatever rate a service provider actually charges; rather, CCA is only required to pay the customary, prevailing hourly rate in Upper Darby and Haverford Township school districts. Thus, it is irrelevant whether, as Plaintiff contends, the $75/hour rate has "absolutely nothing to do with" Fusion's actual rate. In conclusion, this Court finds that the aforementioned calculations collectively establish that CCA's offer of $75/hour was *at least* a customary, prevailing rate in the relevant school districts, if not a slightly higher, more generous rate. Therefore, CCA did not violate the Hearing Officer's Decision and Order when it offered the $75/hour conversion rate arrangement.

As demonstrated above, all of CCA's proposals were consistent with the terms of the CEA and did not violate the Decision and Order. The two remaining proposals are those made by Plaintiff. **Plaintiff's first proposal** was that T.R. receive 334.17 hours of instruction at Fusion, no additional hours at CCA, and 334.17 hours be deducted from the CEA. CCA rejected this proposal because it did not provide T.R. with the 990 hours of instructional time per academic year required in Pennsylvania. Indeed, CCA could not agree to Plaintiff's proposal because it would have resulted in T.R. missing 655.83 hours of required instruction and, thereby, in CCA failing to fulfill its legal obligations as T.R.'s LEA and in denying T.R. a FAPE once again. Therefore, CCA's rejection of this proposal was consistent with the terms of the CEA, and with CCA's obligations under state law.

**Plaintiff's second proposal** was that T.R. receive 1080 hours of instruction at Fusion (540 hours of one-on-one instructional sessions and 540 hours of "homework café" sessions) and only 540 hours be deducted from the CEA. As noted, CCA rejected this proposal because it insisted on deducting the exact number of hours from the CEA as the number of hours of services actually rendered. As explained above regarding CCA's

counteroffer of deducting the exact number of hours (1080 hours) from the CEA (*see supra* p. 11-12), there is nothing improper about an hour-for-hour deduction. Thus, CCA did not violate the Hearing Officer's Decision and Order when it rejected Plaintiff's request that only half of the hours of services rendered be deducted from T.R.'s CEA. As such, this Court finds that CCA's rejection of each of Plaintiff's proposals was consistent with the terms of the CEA and did not violate the Decision and Order.

In conclusion, this Court finds that the undisputed facts establish that CCA did not violate, or fail to comply with, the Hearing Officer's Decision and Order regarding T.R.'s CEA when it made the various proposals that it did, and rejected Plaintiff's proposals, regarding T.R.'s receipt of services from Fusion. Each of CCA's proposals were consistent with the terms of the CEA and with CCA's legal obligations to T.R. as his LEA. Accordingly, CCA's motion for summary judgment on Count I of Plaintiff's complaint is granted, to the extent that the claim is based on CCA's actions regarding Fusion, and Plaintiff's motion for summary judgment on Count I is denied, to the same extent.[10]

---

[10]    Regarding Plaintiff's general assertion that CCA's proposals denied her "full access" to the CEA, as demonstrated above, each of CCA's proposals reflected a willingness to use the CEA hours to facilitate T.R.'s receipt of full-time services at Fusion. At no time did CCA refuse to pay for Fusion's services, nor did CCA ever inform Plaintiff that she could not use the full number of hours of the CEA for T.R.'s services at Fusion. CCA merely made several proposals as to how the CEA hours could lawfully be distributed to facilitate T.R.'s full-time services at Fusion.

Thus, while Plaintiff is correct that she was "precluded from using the [CEA] to fund the [original] full-time educational plan for [T.R.]," (Plf. Br., ECF 26, at p. 20), she was so precluded because that plan failed to satisfy Pennsylvania's legal requirement that T.R. receive 990 hours of instruction per academic year. In contrast, the undisputed facts clearly establish that Plaintiff *was not* precluded from using the CEA to fund the revised course plan at Fusion. Indeed, T.R. did attend Fusion for the 2019-2020 academic year and CCA paid Fusion's invoices in full, using the CEA (although the precise number of hours to be deducted from the CEA has yet to be determined).

## *II. CCA's Actions Regarding Advocacy Unlimited*

In CCA's motion for summary judgment, it argues that the undisputed facts establish that its refusal to pay for the services rendered by Education and Behavioral Health Consultant, Naomi Studevan, did not violate the Hearing Officer's Decision and Order because the terms of the CEA do not permit the CEA hours to be used for such services. In Plaintiff's motion for summary judgment, Plaintiff disagrees and argues that CCA's refusal to pay Studevan does violate the Hearing Officer's Decision and Order because Studevan's services were rendered "on behalf" of T.R. and are "completely consistent with the terms of the [CEA]."[11] This Court agrees with CCA.

As noted, the Hearing Officer's Decision and Order requires CCA to pay a provider selected by Plaintiff for "whatever specially-designed instruction, related services, assistive technology, supplemental services, and aids necessary to make [T.R.] whole." (Hearing Officer's Decision, ECF 24-1, Ex. A, at p. 22). It is undisputed that Advocacy Unlimited did not provide T.R. with "specially-designed instruction" or "assistive technology." Thus, the remaining categories of services permitted by the CEA are "related services" and "supplemental services[] and aids," both of which are terms of art defined in the IDEA regulations. This Court must determine whether Studevan's services could fall under either remaining category.

The services Studevan rendered included: phone calls and meetings "with parent"; "[r]eview of documentation"; "correspondence with CCA via email"; "[c]orresponding

---

[11]     Notably, in the Argument Section of Plaintiff's motion, she does not specify *how* Studevan's services are consistent with the CEA. Rather, she merely conclusively states that the services are consistent. (*See* Plf. Br., ECF 26, at p. 21-22). However, this Court attempted to glean more specific arguments regarding the nature of Studevan's services from the remainder of Plaintiff's motion.

with mom and CCA attorney via email"; and attending an "IEP meeting."  (Invoices, ECF

2, Ex. D, at p. 118-19).  "Related services" is defined in the IDEA regulation as:

> transportation and such developmental, corrective, and other supportive
> services as are required to assist a child with a disability to benefit from
> special education, and includes speech-language pathology and audiology
> services, interpreting services, psychological services, physical and
> occupational therapy, recreation, including therapeutic recreation, early
> identification and assessment of disabilities in children, counseling services,
> including rehabilitation counseling, orientation and mobility services, []
> medical services for diagnostic or evaluation purposes[, and] school health
> services and school nurse services, social work services in schools, and
> parent counseling and training.

34 C.F.R. § 300.34(a).  None of Studevan's services are among those listed as "related

services."

The final remaining category, "supplemental aids and services," is defined in the

IDEA regulations as: "aids, services, and other supports that are provided in regular

education classes, other education-related settings, and in extracurricular and nonacademic

settings, to enable children with disabilities to be educated with nondisabled children to the

maximum extent appropriate[.]"  34 C.F.R. § 300.42.  Again, it is plain that none of

Studevan's services were provided to T.R. "in regular education classes, other education-

related settings, and in extracurricular and nonacademic settings, to enable [T.R.] to be

educated with nondisabled children."[12]  This Court finds that because Studevan's services

do not fall into any of the identified categories of services permitted under the CEA, T.R.'s

CEA funds cannot be used to pay for those services.

---

[12]     *See*, *e.g.*, *M.C. v. Knox Cnty. Bd. of Educ.*, 2018 U.S. Dist. LEXIS 95943, at *19-20 (E.D. Tenn.
June 7, 2018) (finding that a "paraprofessional" or "aide" *may* be considered a supplement aid or service
"to the extent that the aide *provides itinerant instruction or otherwise works directly with the student*. . . .
But to the extent that the aide works with other school staff to the student's general benefit, such assistance
is more properly characterized as support for school personnel [rather than support for the student]."
(emphasis added)).

Notably, Plaintiff's arguments regarding this issue are silent on how Studevan's services could possibly fall into one of the identified permitted categories of services. Plaintiff appears to argue that Studevan's services are consistent with the CEA because Studevan is a professional in the field of Education Consulting and has previously been compensated using other children's CEAs.   Those facts, however, are irrelevant; Studevan's area of expertise and previous employment regarding other children are immaterial if the services she rendered *in this case* do not fall within any of the prescribed categories permitted by the Hearing Officer's Decision and Order establishing the CEA, as is the case here.  This Court is sympathetic to Plaintiff's frustration that led her to hire an advocate; however, no amount of sympathy and/or frustration changes the terms of the Hearing Officer's Decision and Order, which this Court must enforce.

Plaintiff also appears to argue that Studevan's services are consistent with the CEA because Studevan's advocacy services were necessary to secure several agreements from CCA regarding T.R.'s education.  Plaintiff indicates that she had been negotiating with CCA on her own for several desired outcomes for T.R., such as CCA "includ[ing] present level documentation in TR's IEP," agreeing "to provide course for all of TR's courses in hard copy[,]" and finalizing T.R.'s services at Fusion, (Plf. Br., ECF 26, at p. 21), to no avail; however, when Studevan assisted Plaintiff in advocating for those same outcomes, they were quickly obtained.  (*See id*.).  Even assuming that Plaintiff's negotiations with CCA *did* dramatically improve and became successful because of Studevan's support, that fact—again—does not change the fact that Studevan's services do not fall under any of the identified permissible categories.[13]

---

[13]      Plaintiff does have the right to choose a provider, but that right is not unbridled—she must choose a qualified provider that satisfies the requirements of the Hearing Officer's Decision and Order.  *See Millay*

In addition to the fact that Studevan's services do not fall into any of the prescribed categories, the law surrounding the purpose and intent of CEAs further illustrates that those services are not contemplated by T.R.'s CEA.  The purpose of a compensatory education award ("CEA") is "to make up for past failures on the part of the [LEA.]"  *Ferren C. v. Sch. Dist. of Phila.*, 612 F.3d 712, 719 (3d Cir. 2010).  If a student was deprived of a FAPE, then "the student could only be fully compensated by [a CEA] that contains elements of a FAPE that she [or he] was previously denied."  *Id.* at 720.  That is, a CEA "must be reasonably tailored to address the education deficit that resulted from the educational agency's failure to provide the student a FAPE."  *Stapleton v. Penns Valley Area Sch. Dist.*, 2017 U.S. Dist. LEXIS 204143, at *18 (M.D. Pa. Dec. 12, 2017) (citing *C.G. v. Five Town Cmty. Sch. Dist.*, 513 F.3d 279, 290 (1st Cir. 2008)).  Thus, the disbursement of CEA funds "must align with identified educational services the student did not receive from the school district for the period of time he or she was deprived a FAPE."  *Id.* at 18.  The invoices Advocacy Unlimited issued for Studevan's services do not indicate that any instructional or educational services were provided to T.R., or that anyone from Advocacy Unlimited ever spoke with T.R.  (*See* Def. Br., ECF 25, at p. 18-19).  Based on these invoices, none of the services rendered could "align with the educational services [T.R.] did not receive from [CCA when CCA deprived T.R.] of a FAPE[,]" as identified in the Hearing Officer's Decision and Order.  *Stapleton*, 2017 U.S. Dist. LEXIS 204143, at *18.  Nor could the services conceivably be characterized as "execut[ing] the equitable remedy of specific

---

*v. Surry Sch. Dep't*, 2011 U.S. Dist. LEXIS 31048, at *29-30 (D. Me. March 23, 2011) (noting that using a CEA to establish a pool of money from which a parent can "draw upon when and how it sees fit . . . has little resemblance to an [IEP]").

performance of [CCA]'s past FAPE duties[,]" as the Hearing Officer's Decision and Order requires.[14]  (Hearing Officer's Decision, ECF 24-1, Ex. A, at p. 21).

In conclusion, the purpose of T.R.'s CEA is to remedy CCA's past failures and provide T.R. with a FAPE by implementing an IEP that *is* "reasonably calculated to provide 'meaningful benefit' and 'significant learning.'"  (*Id*. at p. 20).  The services rendered by Advocacy Unlimited, through Studevan, are not qualifying services under T.R.'s CEA.  As the entity legally responsible for providing T.R. with a FAPE, implementing T.R.'s IEP, and disbursing the CEA, CCA had not only the right, but the *obligation* to ensure that hours from T.R.'s CEA award were used for the services described and permitted by the Hearing Officer's Decision and Order.  Therefore, CCA did not violate the Hearing Officer's Decision and Order when it rejected Plaintiff's request to use T.R.'s CEA hours to pay for the advocacy services provided by Studevan.  CCA's refusal to pay Advocacy Unlimited was consistent with the terms of the CEA and CCA's legal obligations to T.R. as his LEA. Accordingly, CCA's motion for summary judgment on Count I of Plaintiff's complaint is granted, to the extent that the claim is based on CCA's actions regarding Advocacy Unlimited, and Plaintiff's motion for summary judgment on Count I is denied, to the same extent.

### *Count II of Plaintiff's Complaint: Section 504 Retaliation*

At Count II of the complaint, Plaintiff asserts a retaliation claim under Section 504 of the Rehabilitation Act.  This statute provides that no qualified, disabled individual can

---

[14]     This requirement, related to the root purpose of CEAs, is further evidenced in T.R.'s CEA's requirement that any provider must provide "a progress report verifying [T.R.]'s measurable progress." (Hearing Officer's Decision, ECF 24-1, Ex. A, at p. 21).  Here, Advocacy Unlimited would have no basis for creating a report on T.R.'s progress because it did not actually provide services to T.R. that specifically performed CCA's past FAPE duties.

"be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance" because of his or her disability.  29 U.S.C. § 794(a).  Under the anti-retaliation provision that applies to the Rehabilitation Act, "[n]o recipient or other person shall intimidate, threaten, coerce, or discriminate against any individual for the purposes of interfering with any right or privilege secured by [the Rehabilitation Act], or because he [or she] has made a complaint, testified, assisted, or participated in any manner in an investigation, proceeding or hearing . . . ."  34 C.F.R. § 100.7(e).

Plaintiff contends that CCA retaliated against her for engaging in the following protected activities: (1) filing due process complaints; (2) participating in due process hearings; and (3) identifying and securing third-party providers pursuant to the Hearing Officer's Decision and Order.  (Plf. Br., ECF 26, at p. 22).  Plaintiff further argues that CCA retaliated against her by "attempt[ing] to delay compliance with the [Hearing Officer's Decision and Order] in an attempt to run out the clock and prevent [Plaintiff] from fully implementing the [CEA] and utilizing all of the compensatory hours in a timely manner."  (*Id.*).  Only Plaintiff moves for summary judgment on this claim.

"When the moving party has the burden of proof at trial, that party must show affirmatively the absence of a genuine issue of material fact: it must show that, on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party."  *Tonglu Rising Sun Shoes Co. v. Natural Nine (USA) Co.*, 2016 U.S. Dist. LEXIS 175701, at *5 (D.N.J. Dec. 20, 2016) (quoting *In re Bressman*, 327 F.3d 229, 238 (3d Cir. 2003)) (internal quotations omitted).  Accordingly, Plaintiff has the burden of identifying undisputed material facts that establish the elements

of her Section 504 Retaliation claim, *to wit*: (1) Plaintiff engaged in a protected activity; (2) CCA engaged in a retaliatory action sufficient to deter a person of ordinary firmness from exercising his or her rights; and (3) a causal connection between the protected activity and the retaliatory action. *Stapleton*, 2017 U.S. Dist. LEXIS 204143, at *22-23 (citing *Lauren W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007)).

In its response, CCA argues, and this Court agrees, that Plaintiff's motion for summary judgment is deficient in that Plaintiff does not cite to *any* materials in the record to support her factual assertions, as Rule 56 requires the moving party to do. CCA further contends that, contrary to Plaintiff's assertions, it is *not* undisputed that CCA engaged in retaliatory actions and/or that a causal connection exists between those alleged actions and Plaintiff's protected activities; indeed, CCA *does* dispute those allegations. In light of these glaring disputes of material fact, and Plaintiff's failure to comply with Rule 56 and identify particular parts of materials in the record that support her assertions, Plaintiff's motion for summary judgment in her favor on her Section 504 Retaliation claim is denied.

### Count I of CCA's Counterclaims: Declaratory Judgment

At Count I of CCA's counterclaims, CCA seeks a declaratory judgment that "CCA's obligation to pay for compensatory education services is limited to the market rate for such services in the geographic area where the services are provided" and that "the market rate for tutoring services in the greater Philadelphia area is $75 per hour." (Amended Counterclaim, ECF 20, at p. 4). Under the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq*, a court may "declare the rights and other legal relations of any interested party" in "case[s] of actual controversy within its jurisdiction[.]" 28 U.S.C. § 2201(a). It is well-settled that the statute's phrasing "refers to the types of 'Cases' and 'Controversies'

that are justiciable under Article III [of the U.S. Constitution.]" *Matthews v. Pa. Dep't of Corr.*, 827 F. App'x 184, 186 (3d Cir. 2020) (citing *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007)).

### I. Availability of Jurisdiction

Here, the parties disagree as to whether an actual case or controversy exists to serve as a basis for a declaratory judgment. "A 'case of actual controversy' means one of a justiciable nature. 'The controversy must be definite and concrete, touching the legal relation of the parties having adverse legal interests.'" *Abraham v. Del. Dep't of Corr.*, 331 F. App'x 929, 931 (3d Cir. 2009) (quoting *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240-41 (1937)). The United States Court of Appeals for the Third Circuit ("Third Circuit") identified three factors for courts to consider in determining whether a case or controversy exists for the purposes of a declaratory judgment, *to wit*: (1) whether the parties have adverse interests; (2) the conclusivity of the proposed judgment; and (3) the practical utility of the proposed judgment. *Step-Saver Data Systems, Inc. v. Wyse Technology*, 912 F.2d 643, 647-50 (3d Cir. 1990).

Here, CCA contends that a case of actual controversy exists because all three *Step-Saver* factors indicate as much; specifically, (1) the parties have participated in several lawsuits regarding enforcement of the Hearing Officer's Decision and Order, demonstrating their adversity, and the claims in the underlying civil action demonstrate the explicit disagreement between the parties as to how much providers are to be paid under T.R.'s CEA; (2) the proposed judgment would set a final dollar-amount for all future disagreements as to how much the providers are to be paid; and (3) the proposed judgment would both settle ongoing disputes and prevent tenuous future litigation regarding what

hourly rate applies for services rendered to T.R. under his CEA.  This Court agrees that application of the *Step-Saver* factors indicates the existence of an actual controversy here.

In opposition, Plaintiff's only argument is that "CCA had never objected to, or challenged, the hourly rate being charged [by other service providers]."  (Plf. Br., ECF 26, at p. 24).  That is, Plaintiff "denies an actual controversy exists regarding an appropriate hourly rate because CCA had never previously raised this issue." (*Id*.).  Plaintiff also adds that she "has never taken any position as to the prevailing rate[.]" (*Id*. at p. 23).  Plaintiff's argument is misguided.  First, Plaintiff is incorrect that CCA has never raised an issue regarding an appropriate hourly rate.  To the contrary, some of the underlying claims in this very lawsuit pertain to how much a service provider (Fusion) should be paid and at what rate.  Second, though she now denies doing so, Plaintiff *does*, indeed, take a position as to the prevailing rate—in her motion, Plaintiff wrote that she "denies the payment obligation is limited to the hourly rate for services that is (*sic*) customary in the geographic market." (*Id*.).  Third, it is irrelevant whether CCA "raised" this issue with Plaintiff prior to the date Plaintiff filed this lawsuit.  What *is* relevant is whether the issue presently *exists*, which the underlying litigation and record clearly indicate it does.

In conclusion, because the *Step-Saver* factors indicate the existence of an actual controversy here, and Plaintiff's arguments do not demonstrate anything to the contrary, this Court finds that an actual controversy does exist sufficient to serve as a basis for a declaratory judgment.

## II. Decision to Exercise Jurisdiction

Having determined that an actual case and controversy exists, this Court must now determine whether to exercise its discretion under the Declaratory Judgment Act ("DJA").

*See Allen v. Debello*, 861 F.3d 433, 443 (3d Cir. 2017) ("Given the statute's textual commitment to discretion, and the breadth of leeway we have always understood it to suggest, district courts possess discretion in determining whether and when to entertain an action under the Declaratory Judgment Act" (internal quotations and alterations omitted)). Declaratory judgment actions are unique in that, "[r]ather than being subject to the normal principle that federal courts should adjudicate claims within their jurisdiction, district courts exercising [DJA] discretion are governed by considerations of practicality and wise judicial administration." *Reifer v. Westport Ins. Corp.*, 751 F.3d 129, 139 (3d Cir. 2014) (citing *Wilton v. Seven Falls Co.*, 515 U.S. 277, 288 (1995)) (internal quotations omitted). In *Reifer*, the Third Circuit

> enumerated factors for district courts to consider when exercising DJA discretion. [District courts are] required . . . to consider four general factors: (1) the likelihood that a federal court declaration will resolve the uncertainty of obligation which gave rise to the controversy; (2) the convenience of the parties; (3) the public interest in settlement of the uncertainty of obligation; and (4) the availability and relative convenience of other remedies. [The Third Circuit has] also suggested that courts seek to prevent the use of the declaratory action as a method of procedural fencing, or as a means to provide another forum in a race for *res judicata*.

*Id*. at 140 (internal quotations and citations omitted). Additionally, "the absence of a pending state case create[s] a rebuttable presumption in favor of jurisdiction." *Rarick v. Federated Serv. Ins. Co.*, 852 F.3d 223, 226 (3d Cir. 2017) (citing *Reifer*, 751 F.3d).

Here, there is no parallel state litigation, so there is a rebuttable presumption in favor of this Court exercising jurisdiction over the declaratory judgment claim. Upon consideration of the factors set forth in *Reifer*, this Court finds that the presumption is not rebutted. Regarding the first factor, the requested declaration would resolve the uncertainty surrounding the rate at which CCA is obligation to pay service providers. Regarding the

second factor, resolving this issue now is clearly convenient for the parties and there is no obvious inconvenience for either party if the declaration is made.  Relatedly, the fourth factor requires consideration of the availability and comparative convenience of other remedies.  An alternative would essentially include future litigation, which would subject the parties to additional costs, efforts, and delays in the disbursement of T.R.'s CEA hours—clearly such an alternative is not more convenient for the parties.  The final factor (the public interest) also weighs in favor of exercising jurisdiction because settling the uncertainty of CCA's payment obligations for T.R.'s CEA now would prevent additional public funds from being needlessly spent in future litigation between the parties, including the court system's costs and resources, as well as CCA's resources, as a public charter school.  In light of these circumstances, this Court will exercise its discretion and retain jurisdiction of the declaratory judgment claim.

### III. Analysis of Declaratory Judgment Claim

CCA seeks a declaratory judgment that "CCA's obligation to pay for compensatory education services is limited to the market rate for such services in the geographic area where the services are provided" and that "the market rate for tutoring services in the greater Philadelphia area is $75 per hour."  (Amended Counterclaim, ECF 20, at p. 4). "The standard for granting summary judgment in a declaratory judgment action is the same as for any other type of relief."  *Selective Ins. Co. of Am. v. Novitsky*, 366 F. Supp. 3d 638, 644 (M.D. Pa. 2019) (citing *Cloverland-Green Spring Dairies, Inc. v. Pa. Milk Marketing Board*, 298 F.3d 201, 210 n.12 (3d Cir. 2002)).  CCA bears the burden of proof at trial for this claim, on which both parties move for summary judgment.

In CCA's motion, it argues that this Court should grant summary judgment in its favor because the evidence it produced (regarding the rates charged for tutoring and instruction in the Upper Darby and Haverford school districts) is not disputed by Plaintiff, and Plaintiff did not offer any evidence to the contrary to establish what the customary, prevailing hourly rate for tutoring and instruction is in the community, market, or location T.R. receives services.  In her motion, Plaintiff argues that summary judgment should be granted in her favor because (1) the Hearing Officer's Decision and Order "does not limit services to the greater Philadelphia area[,]" and (2) the "broad range of services should not be defined by a single arbitrary conversion rate."  (Plf. Br., ECF 26, at p. 25).

First, this Court will address CCA's request for a declaratory judgment that "CCA's obligation to pay for compensatory education services is limited to the market rate for such services in the geographic area where the services are provided."  As explained *supra*,[15] a concise statement of the funding requirement imposed on CCA by the Hearing Officer's Decision and Order is that CCA must pay service providers <u>at the customary, prevailing hourly rate in the community, market, or location where T.R. receives services.</u>  This statement is the extent of CCA's obligation.  Contrary to Plaintiff's assertion, CCA is not required to pay whatever rate a provider charges.  Comparing the language in CCA's requested declaration with the language in the Hearing Officer's Decision and Order reveals that CCA's requested declaration substitutes the word "market" for the words "customary, prevailing hourly" and the word "geographic area" for "community, market, or location."  Though the meanings of the differing words are similar, the language of the Hearing Officer's Decision and Order controls.  Accordingly, this Court will grant

---

[15]    *See supra* p. 9.

declaratory judgment in CCA's favor on this first request, *using the language sourced from the Hearing Officer's Decision and Order.*

As to the second portion of CCA's request for a declaratory judgment, which seeks a declaratory judgment that "the market rate for tutoring services in the greater Philadelphia area is $75 per hour," the precise language of the Hearing Officer's Decision and Order again controls.  The Hearing Officer's Decision and Order establishes that the geographic area from which to determine the customary, prevailing hourly rate is <u>the community, market, or location where T.R. receives services.</u>  CCA asks this Court to hold that the "community, market, or location where T.R. receives services" is the Greater Philadelphia Area.  In opposition, Plaintiff argues that the Decision and Order "does not limit services to the greater Philadelphia area."  Plaintiff is correct.  The Decision and Order do not further define the "community, market, or location" where T.R. receives services.  While the Greater Philadelphia Area arguably *could* constitute a valid geographic location from which to pull the applicable data, the parties dispute whether the Greater Philadelphia Area is the correct or only articulation of the permitted geographic location.  Thus, to the extent CCA seeks a declaration that the applicable rate for tutoring services in the Greater Philadelphia Area is the rate that applies to *all* of T.R.'s tutoring services, such a declaration would be inconsistent with the broader terms of the Hearing Officer's Decision and Order.

Furthermore, the evidence CCA points to in order to support its claim that the applicable rate in the Greater Philadelphia Area is $75/hour consists only of example rates in Upper Darby and Haverford Township school districts.  Plaintiff argued that "a single arbitrary conversion rate" should not be declared.  Indeed, even CCA's proposed geographic location—the Greater Philadelphia Area—consists of many more than those

two school districts.  While the average rate that CCA produced is not arbitrary and is based on actual tutoring contracts *within* the Greater Philadelphia Area, to declare that an average rate within two school districts is representative of the *entire* Greater Philadelphia area would not be supported by the record evidence.  While CCA is correct that Plaintiff does not dispute CCA's evidence of the hourly rates for tutoring and instruction in the in Upper Darby and Haverford Township school districts, that undisputed evidence is not necessarily sufficient to satisfy CCA's burden of establishing the rate in the Greater Philadelphia Area.  Thus, reasonable jurors could disagree as to whether the undisputed evidence that CCA produced constitutes the proper rate under the Hearing Officer's Decision and Order.  Accordingly, CCA's motion for summary judgment regarding this declaration is denied.

Regarding Plaintiff's motion for summary judgment on this claim, as the previous discussion demonstrates, the parties dispute the sufficiency of CCA's proffered evidence.  Therefore, Plaintiff did not meet her own summary judgment burden of identifying the *absence* of genuine issues of material fact regarding this declaration.   Accordingly, Plaintiff's motion for summary judgment regarding this declaration is denied.

### *Count II of CCA's Counterclaims: Wrongful Use of Civil Proceedings*

At Count II of CCA's counterclaims, CCA asserts a Wrongful Use of Civil Proceedings claim against Plaintiff based on the history of thirteen civil actions that Plaintiff has filed against CCA over the last five years.  To prove this claim, CCA will need to establish that Plaintiff (1) "t[ook] part in the procurement, initiation or continuation of civil proceedings against" CCA and (2) "act[ed] in a grossly negligent manner or without probable cause and primarily for a purpose other than that of securing the proper discovery, joinder of parties or adjudication of the claim in which the proceedings are based[,]" and

that (3) "the proceedings have terminated in favor of [CCA]." 42 Pa. Cons. Stat. § 8351(a). Only Plaintiff moves for summary judgment on this claim.

In her motion, Plaintiff merely restates her denials of the allegations in CCA's counterclaim as first indicated in her answer to CCA's counterclaim; indeed, Plaintiff literally continuously states that she "denies" the "allegations" made by CCA. (Plf. Br., ECF 26, at p. 26-30). Plaintiff summarizes her argument by stating that "[n]one of her civil proceedings against CCA have been egregious or initiated and continued with improper motives." (*Id*. at p. 30).[16] For summary judgment to be granted in Plaintiff's favor on this claim, Plaintiff would needed to show "that there is no genuine dispute as to any material fact [regarding the Wrongful Use of Civil Proceedings claim] and [that she] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Not only did Plaintiff not identify any evidence "demonstrat[ing] the absence of a genuine issue of material fact[,]" *Celotex Corp.*, 477 U.S. at 323, Plaintiff's consistent denials of CCA's factual allegations demonstrate the very existence of disputed issues of material facts essential to resolving this claim (*i.e.*: whether Plaintiff acted in a grossly negligent manner or without probable cause; whether Plaintiff acted for an improper purpose). Because Plaintiff failed to show the absence of a genuine issue of material fact, and because the record evidence demonstrates the continued existence of disputed issues of material facts, Plaintiff's motion for summary judgment on CCA's Wrongful Use of Civil Proceedings claim is denied.

---

[16]     Notably, CCA accurately points out that, once again, Plaintiff's motion does not cite to *any* materials in the record to support her factual assertions, as Rule 56 requires her to do.

**CONCLUSION**

For the reasons stated herein, CCA's partial motion for summary judgment is granted, *in part*, and denied, *in part*, and Plaintiff's motion for summary judgment is denied.   An Order consistent with this Memorandum Opinion, which sets forth the corresponding declaratory judgment, follows.


*NITZA I. QUIÑONES ALEJANDRO*, U.S.D.C. J.